UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SYNAGRO NORTHEAST, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 12 Civ. 2251 (LMS) |
| | ) | |
| - against - | ) | **DECISION AND ORDER** |
| | ) | |
| MACE CONTRACTING CORP., | ) | |
| COLONIAL SURETY COMPANY, AND | ) | |
| COUNTY OF WESTCHESTER, | ) | |
| | ) | |
| Defendants. | ) | |

Lisa Margaret Smith, U.S.M.J.

## I.    Introduction

Plaintiff subcontractor Synagro Northeast, LLC (hereinafter "Synagro"), commenced the instant action against (1) defendant general contractor Mace Contracting Corp. (hereinafter "Mace") to recover on a breach of contract claim and (2) defendant Colonial Surety Company (hereinafter "Colonial") to collect on a payment and performance bond executed in connection with the related contract.  Synagro asserts that Mace breached a subcontract between the two parties when Mace failed to pay Synagro in full for its work on such subcontract.  Defendants counterclaimed to rescind or reform the subcontract on theories of fraud, constructive fraud, and mutual mistake, as well as for damages on theories of unjust enrichment and breach of the covenant of good faith and fair dealing.  Now before the Court are (1) Synagro's motion for (a) summary judgment on its claims, (b) summary judgment dismissing Mace's counterclaims and several of its affirmative defenses, and (c) attorney's fees from Colonial; (2) Mace's cross motion for summary judgment on its counterclaims; and (3) Colonial's cross motion for summary

1

judgment on Mace's counterclaims.  For the reasons set forth below, Synagro's motion for

summary judgment is granted in part, as to liability, as to a partial claim for damages, as to its

entitlement to attorney's fees from Colonial, and as to the dismissal of Mace's counterclaims as

well as its affirmative defenses of mutual mistake, but is otherwise denied; Colonial's

counterclaims are sua sponte dismissed; Mace's cross motion for summary judgment is denied in

its entirety; and Colonial's cross motion for summary judgment is denied in its entirety.  The

parties are to make further submissions on the issues of damages.

## II.  **Background**

### A.  **Facts**[1]

This action stems from a 2008 public works project concerning renovations, cleaning,

demolition, and removal of old equipment at the New Rochelle Wastewater Treatment Plant

(hereinafter "the Treatment Plant").  Docket Entry #54, Exh. 5, Contract and Bond.  The County

of Westchester (hereinafter "the County"), owner of the Treatment Plant, sought a general

contractor to perform specific work on the project, including "the removal and disposal of the

Grit Residue from two (2) Oxygenation Tanks and for the cleaning of the interior surfaces of the

tanks to permit inspection by the Engineer."[2]  Docket Entry #54, Exh. 6, Materials and

---

[1]  Unless otherwise noted, the following facts are undisputed and are taken from the
parties' submissions pursuant to Local Civil Rule 56.1.  Docket Entry #47, Mace's Rule 56.1
Statement; Docket Entry #55, Synagro's Rule 56.1 Statement; Docket Entry #61, Synagro's
Counter Statement; Docket Entry #65, Mace's Counter Statement; Docket Entry #62, Colonial's
Counter Statement.  Where the Court cites to only one party's Rule 56.1 statement, the opposing
parties do not dispute that fact with admissible evidence.  Any relevant factual disputes are
noted.  The facts are construed, as they must be at summary judgment, in the light most
favorable to the nonmoving party.  See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.,
473 F.3d 450, 456 (2d Cir. 2007).

[2]  The County defined grit residue as "[a]ll sand, particulates, grease, water, mixed liquor,
and sludge materials remaining in the Oxygenation Tanks after the draining to the extent

Performance at ¶ 1.01(A)(1).  When calling for bidders, the County stated that the general

contractor was to "[p]rovide all labor, materials, equipment, services and incidentals necessary

for the removal and disposal of the Grit Residue from the two (2) Oxygenation Tanks and for the

cleaning of the interior surfaces of the tanks to permit inspection . . . " Id.  The County required

that the grit residue be removed from the tanks, dewatered, placed in watertight containers, and

hauled to a disposal site. Id. at ¶ 3.04(B)-(I).  Dewatering consisted of removing the water from

the residue.

     The County provided potential bidders with a set of "Proposal Pages," which set forth

details of the work, and required that any bid be submitted on the "Proposal Pages" or through an

addendum.  Docket Entry #54, Exh. 8, Proposal Pages; Docket Entry #54, Exh. 7, Information

for Bidders at ¶ 13.  The Proposal Pages set forth itemized details of the work to be completed,

including the quantities of materials to be removed.  Docket Entry #54, Exh. 8, Proposal Pages at

6A.  Under the category labeled "For Removal and Disposal of Oxygenation Tank Grit Residue .

. . ," the Proposal Pages stated an "Approximate Quantit[y]" of 1,600 tons. Id.  The County

emphasized that such amounts were "approximate estimated quantities."  Docket Entry #54, Exh.

7, Information for Bidders at ¶ 16.

     In October, 2008, utilizing the Proposal Pages, Mace submitted a bid to the County in the

amount of $1,547,000, and the bid was signed by Mace's President, Vladimer Blaise.  Docket

Entry #54, Exh. 9, Proposal Pages at 6B.  Mace offered to remove, dewater, and dispose of the

grit residue for $100 per ton, which amounted to $160,000 for the approximated 1,600 tons. Id.

at 6A.  As the "lowest responsible bidder," Mace won the contract.  Docket Entry #54, Exh. 5,

---

practical the freestanding mixed liquor."  Docket Entry #54, Exh. 6, Materials and Performance
at ¶ 1.02(A).

Contract and Bond at 1, 4.

Echoing the County's original call for bidders, the contract required Mace to "[p]rovide all labor, materials, equipment, services and incidentals necessary for the disposal of the Grit Residue from the two (2) Oxygenation Tanks and for cleaning of the interior surfaces of the tanks to permit inspection by the Engineer . . ." Docket Entry #54, Exh. 6, Materials and Performance at ¶ 1.01(A)(1). It gave only limited instruction on the method for cleaning the oxygenation tanks. See id. at ¶ 3.03(C). The contract noted that "Grit Residue shall be dewatered prior to transportation for disposal." Id. at ¶ 3.04(C).

The contract provided that the County was not guaranteeing the presence of any certain amount of grit residue, and it stated that if

> the work contemplated by said plans and specifications is modified and reduced and the costs and expenses of such work lessened, that then and in that event the Contractor will do the work as changed and modified and the said Commissioner [of the County] shall estimate the difference between the original estimate of quantities therefor and the amount that should be paid by reason of the modification and change and the difference shall be deducted from the original estimate of quantities therefore of said Contract and said Contractor shall be paid accordingly . . . Any changes, modifications or deductions shall in no way invalidate this Contract and said Contractor agrees that in the event of any such change or modification reducing the original, estimated quantities therefore, it will not make any claim for any profit, or loss of profit by reason thereof.

Id. at 2. The contract further provided:

> The Contractor by the submitting of bids and execution of this Contract hereby covenants and agrees that he has examined the plans, specifications and the site work, as to local conditions, difficulties and accuracy of approximate estimate of quantities and does hereby further covenant and agree that he will not make any claim for damages by reason of any such local conditions, difficulties or variation of approximate estimate of quantities.

Id. at 9. Blaise, in his capacity as President of Mace, signed the contract. Id. at 11.

In accordance with New York State Finance Law § 137, Mace and Colonial, as surety,

subsequently executed a performance and payment bond on the contract with the County for

$1,547,000.00.  See Docket Entry #54, Exh. 16, Performance and Payment Bond.

Mace thereafter contacted a number of companies, including Synagro, seeking a

subcontractor to remove, dewater, and dispose of the grit residue.  See Docket Entry #54, Exh. 4,

Blaise Trans. at 19.  In February, 2009, Synagro submitted to Mace a proposal to remove,

dewater, and dispose of the grit residue for $300 per dewatered ton.[3]  Docket Entry #54, Exh. 11,

February 20, 2009, Dean Letter.  Because the oxygenation tanks were sealed and in use at the

time, Synagro was not able to sample the grit residue prior to submitting the bid.  Docket Entry

#63, Exh. B, Callahan Trans. at 14.  Therefore, Synagro based the bid "on a minimum tonnage of

800 wet tons."  Docket Entry #54, Exh. 11, February 20, 2009, Dean Letter; Docket Entry #63,

Exh. B, Callahan Trans. at 14.  Mace rejected the proposal, indicating that it would not pay

Synagro $300 per dewatered ton for handling the grit residue.  See id. at 62.

Synagro prepared to submit a second bid, and, in April 2009, Synagro's operations

manager, Sean Callahan, took a sample of the grit residue from the oxygenation tanks, which

Synagro had analyzed.  Id. at 38.  On May 14, 2009, Synagro submitted a revised proposal,

offering to perform the residuals work for $200 per dewatered ton.  Docket Entry #54, Exh. 12,

May 14, 2009, Dean Letter.  According to the proposal, Synagro would "replace the Gaskets," as

well as "remov[e], dewater[], transport[] and dispos[e] of the residuals from oxygenation tanks."

Id.  Synagro, however, could only afford to charge Mace the reduced rate of $200 per dewatered

_____

[3] Synagro and Mace negotiated and agreed upon a rate of payment which was based
upon the tonnage of grit residue after it had been dewatered.  At times in the deposition
transcripts and other materials, such dewatered tons are referred to as "wet tons."  Despite such
discrepancies in nomenclature, there is no dispute that Synagro's payment was based upon
dewatered tons of grit residue.  See Docket Entry #63, Exh. B, Callahan Trans. at 12.

ton if Mace guaranteed to pay Synagro for handling at least 1,600 tons of residue.  Docket Entry #63, Callahan Affid. at ¶ 8; Docket Entry #63, Exh. A, Blaise Trans. at 38.  Synagro's proposal accordingly stated: "As discussed we are basing our price and will bill for a minimum tonnage of 1600 wet tons."  Docket Entry #54, Exh. 12, May 14, 2009, Dean Letter.  Blaise agreed that, according to such language, Mace was to "guarantee a quantity of no less than 1600 tons of residuals."  Docket Entry #63, Exh. A, Blaise Trans. at 42.

On June 11, 2009, Mace accepted Synagro's May 14, 2009, proposal, and the two entered into the subcontract, which was drafted by Synagro, requiring "Synagro to provide the following: All equipment and personnel needed to clean, dewater, [t]ransport and dispose of the residuals in the two oxygen aeration tanks."  Docket Entry #54, Exh. 13, Agreement for Professional Services; Docket Entry #44, Blaise Affid. at 5.  The subcontract stated: "Mace Contracting is guaranteeing a quantity of no less than 1600 tons of residuals."  Docket Entry #54, Exh. 13, Agreement for Professional Services.  It also set forth the following "Schedule of Charges:"

| | |
|---|---|
| Gaskets | $900.00 each as needed |
| Mobilization and Demobilization: | $9,250.00 |
| Processing, Trucking and Disposal of 1600 wet tons: | $320,000.00 |
| Processing[,] Trucking and [D]isposal of over 1600 wet tons | $200.00 per wet ton |

Id.  In addition, the subcontract incorporated by reference Synagro's May 14, 2009, letter proposal.  Id.

Thereafter, Synagro began work on the subcontract, utilizing a device known as a belt press to remove and dewater the residue.  However, the composition of the grit residue differed from that expected by Synagro, and it was such that it caused the belt press to cease functioning after several days of work.  Docket Entry #63, Exh. B, Callahan Trans. at 80.  In response, Synagro utilized an alternate approach to remove and dewater the grit residue.  Specifically, it

lowered two skid-steer loaders into each oxygenation tank, which were used to move the solid residuals to one end of the tank, while excess water was pumped from the other end of the tank.[4] See id.; Docket Entry #63, Exh. C, Callahan Affid. at 4.  A crane was then used to transfer the solid residue from each oxygenation tank to a dump truck, which then hauled the waste offsite.

Synagro completed its work on the project in August, 2009.  In the end, the tanks contained between 564 and 566 dewatered tons of grit residue.  Synagro thereafter calculated that it was owed $333,232.50 on the project, including charges of $320,000 for 1,600 tons of grit residue and $9,250 for mobilization and demobilization.  See Docket Entry #54, Exh. 14, All Transactions; Docket Entry #63, Exh. C, Callahan Affidavit at 5.  Synagro fails to account for the remaining $3,982.50 included in the original balance.  Mace made an initial payment of $166,615.25 in December, 2009, as well as further payments of $20,000 in October, 2010, and $20,000 in November, 2010.  Docket Entry #54, Exh. 14, All Transactions.  Mace's records indicated an open balance of $126,616.00.[5]  See id.  Mace made no further payments to Synagro.  On May 2, 2011, Synagro sent Mace an invoice for an additional $11,269.44.  Id.  Synagro provides no explanation for the basis for such additional charges.  Synagro now claims that Mace owes it $137,885.44, which is the sum of the original balance of $126,616.00 and the additional charge of $11,269.44.  Docket Entry #55, Synagro's Rule 56.1 Statement at 9.

--------

[4]  A skid-steer loader, often known as a "Bobcat," is a four-wheeled construction vehicle with a bucket at the front, which can be used to move material.  See What is a Skid Steer or Bob Cat?, http://www.endraulic.co.nz/bobcat (last viewed December 24, 2013).

[5]  Such stated balance seems subject to a mathematical error.  Subtracting the payments made by Mace, which total $206,615.25, from Synagro's original invoice amount of $333,232.50, results in a balance of $126,617.25, which exceeds the $126,616.00 balance in Mace's records by $1.25.  The cause of such discrepancy is unclear from the record.

**B.      Procedural History**

On March 27, 2012, Synagro commenced this action, under the Court's diversity jurisdiction, 28 U.S.C. § 1332(a)(2), against Mace and Colonial.  Docket Entry #1, Complaint.[6][7] Synagro claims to have fully performed under the subcontract because it removed, dewatered, and disposed of all of the grit residue in the tanks, and it alleges that the total value of such work was $344,501.94.  Docket Entry #6, Amended Complaint at ¶¶ 11, 12.  Synagro states that it sent invoices to Mace for the amount due of $344,501.94, that Mace paid only $206,616.50 on the bill, and that Mace owes it $137,885.44 on the subcontract.  Id. at ¶ 13.  According to Synagro, Mace failed to timely pay such remaining balance, thereby breaching the subcontract and causing harm to Synagro.

Synagro asserts New York common law claims for breach of contract and collection on an account stated against Mace.  On both claims, Synagro seeks to recover "$137,885.44, plus late charges equal to one and one-half percent for each thirty-day period from September 28, 2009, together with pre-judgment interest at the statutory rate of nine-percent (9%) per annum

---

[6] Synagro also named the County as a defendant in this matter, seeking to foreclose a mechanic's lien that it had filed against funds held by the County and due to be paid to Mace on the original contract.  Docket Entry #1, Complaint; Docket Entry #6, Amended Complaint; see Docket Entry #54, Exh. 1, Notice of Mechanic's Lien.  Mace thereafter filed a bond with the County, and the lien was discharged pursuant to New York Lien Law § 21(5).  Docket Entry #19, Stipulation of Dismissal.  Accordingly, Synagro, Mace, and the County stipulated to the dismissal of the claim against the County, which the Court so ordered on September 17, 2012. Id.

[7] The matter was originally assigned to the Honorable Vincent Briccetti, United States District Judge, and I was the designated Magistrate Judge.  On September 13, 2012, the parties consented to my exercise of jurisdiction over this matter pursuant to 28 U.S.C. § 636(c).  Docket Entry #16, Consent.

from September 28, 2009." Id. at ¶ 14.[8] Synagro also asserts a claim against Colonial, as surety, to collect the same amount on the payment and performance bond, alleging that it is "a beneficiary under the payment bond," Id. at ¶ 24, because it is a subcontractor of Mace that performed work on the project. Id. at ¶¶ 22, 27. Synagro argues that "[u]nder the payment bond Colonial agreed to pay the wages and compensation for labor performed and services rendered by all subcontractors . . . engaged by Mace to perform work on the Project." Id. at ¶ 23.

Colonial answered with general denials as well as a number of affirmative defenses, including unilateral mistake, mutual mistake, and failure to mitigate damages. See Docket Entry #11, Answer at ¶¶ 1-40. Colonial's Answer also asserts four counterclaims for rescission or reformation of the subcontract, although the pleading fails to set forth any facts to support such counterclaims, and it neglects to label the causes of action upon which such counterclaims are based. In its first counterclaim, Colonial alleges that "Mace made a mistake regarding . . . the procedure and equipment necessary to perform the work," id. at ¶ 42, and "Synagro knew or should have known that its special expertise and machinery were unnecessary to perform the work," id. at ¶ 43, which resulted in "a material adverse effect upon Mace in that the amount to be paid would be egregiously inflated." Id. at ¶ 44. Colonial's second counterclaim generally echoes the allegations in the first, but it instead asserts that Synagro and Mace entered into the subcontract under a mutual mistake. See id. at ¶¶ 47-50. Colonial's third and fourth counterclaims contend that Synagro negligently or intentionally misrepresented facts to induce

---

[8] Synagro seeks such late fees based upon a provision of the subcontract, which states: "Invoices are to be mailed on a monthly basis for work completed during the prior month. The net invoice amount shall be due in full within thirty (30) calendar days from the invoice date. A one and one half percent (1.5%) late charge will be applied to all unpaid balances greater than thirty (30) calendar days unpaid." Docket Entry #54, Exh. 13, Agreement for Professional Services at ¶ 10.

9

Mace into the subcontract.  See id. at ¶¶ 47-58.

Mace thereafter answered, generally denying Synagro's claims.  Docket Entry #30, Amended Answer at ¶ 7-9.  In addition, Mace contends, as affirmative defenses, that (1) Synagro fails to state a cause of action; (2) Synagro's claims are barred by the doctrine of accord and satisfaction; (3) the contract should be rescinded or reformed because the parties were mutually mistaken; (4) any award to Synagro would result in its unjust enrichment; (5) Synagro failed to mitigate its damages; (6) Synagro has received full payment for its work; and (7) any recovery by Synagro is barred by the doctrines of waiver, laches, and unclean hands.  Id. at ¶¶ 15-21, 22-28.

In its Amended Answer, Mace acknowledges that the County's specifications of approximately 1,600 tons of grit residue "was an approximate estimate only."  Id. at ¶ 32.  According to Mace, it and Synagro relied upon such specification when they entered into the subcontract.  Mace accordingly claims that the parties were "mutually mistaken at the time the Synagro Agreement was entered as to the actual amount and the composition of the Residue to be removed."  Id. at ¶ 46.  Mace further asserts that it and Synagro were mutually mistaken as to the composition of the grit residue and "the complexity of the procedures required to remove the Residue."  Id.  Mace alleges that Synagro's use of skid steers, rather than a belt press, "allowed Synagro to perform its work in a simpler and less complicated method given the significant reduction of the Residue, and the material difference in its composition."  Id. at ¶ 40.  It alleges that, as a result, "Synagro was overpaid by approximately $80,000.00 for the labor performed and the equipment and materials provided in connection with the quantity of the Residue actually required to be removed."  Id. at ¶ 43.

Based upon such factual contentions, Mace also asserts a number of counterclaims.  On

10

the theories that it and Synagro were mutually mistaken as to the amount of grit residue present,

the composition of such residue, and the procedures necessary for its removal, Mace seeks

rescission or reformation of the subcontract, as well as a declaratory judgment that it overpaid

Synagro "for the labor performed and the equipment and materials provided with respect to the

Project, and dismissing Synagro's Complaint." Id. at ¶ 47, 49-50.  Mace also counterclaims for

unjust enrichment on the aforementioned theory it overpaid Synagro on the subcontract.  Id. at

¶¶ 51-52.  Finally, Mace claims that Synagro breached the covenant of good faith and fair

dealing, stating that, "[b]y virtue of its actions and/or omissions . . . , Synagro sought to deprive

Mace of the benefits of the terms and conditions of the Synagro Agreement." Id. at ¶ 55.

Synagro answered the counterclaims of Mace and Colonial, asserting general denials, as

well as a number of affirmative defenses, which included that defendants fail to state a claim and

that Mace breached the subcontract.  Docket Entry #11, Answer at ¶¶ 20-32; Docket Entry #13,

Answer to Amended Counterclaims at ¶¶ 31-43.

Following the completion of discovery, the parties cross-moved for summary judgment.[9]

## C.   Cross-Motions for Summary Judgment

On October 7, 2013, the parties cross-moved for summary judgment.  Specifically,

Synagro seeks (1) judgment on its breach of contract claim against Mace, (2) dismissal of Mace's

counterclaims and those of its affirmative defenses that seek reformation or rescission of the

---

[9]  In April, 2013, Synagro filed for reorganization under chapter 11 of the Bankruptcy
Code in the United States Bankruptcy Court for the District of Delaware (Shannon, J.), which
automatically stayed the instant counterclaims of Mace and Colonial.  See 11 U.S.C. § 362(a)(1).
By order dated August 12, 2013, the Bankruptcy Court judge approved a stipulation between the
parties to modify the stay insofar as to permit Mace and Colonial to pursue their counterclaims
against Synagro in the instant action.  Docket Entry #45, Exh. 1, Order Approving Stipulation
Modifying Automatic Stay to Allow Prosecution of Counterclaims in Synagro Northeast, LLC v.
Mace Contracting Corp.

contract on the basis of mutual mistake, (3) dismissal of Mace's counterclaim for unjust enrichment, (4) dismissal of Mace's counterclaim for breach of the covenant of good faith and fair dealing, (5) judgment on its claim for recovery from Colonial on the Payment and Performance Bond, and (6) attorney's fees from Colonial.  Docket Entry #48, Mot. for Summary Judgment; Docket Entry #56, Memo. of Law.

Through its cross motion, which was filed on the same day as Synagro's motion, Mace seeks summary judgment on  its counterclaims against Synagro for (1) rescission or reformation of the contract on the basis of mutual mistake, (2) unjust enrichment, and (3) breach of the covenant of good faith and fair dealing.  See Docket Entry #43, Motion for Summary Judgment; Docket Entry #46, Memo. of Law.  Colonial's cross motion simply relies on Mace's defenses and counterclaims.  See Docket Entry #52, Motion for Summary Judgment; Docket Entry #53, Memo. of Law.

Mace and Colonial opposed Synagro's motion for summary judgment.  See Docket Entry #58, Mace's Memo. of Law in Opp.; Docket Entry #59, Colonial's Memo. of Law in Opp.[10] Synagro opposed defendants' cross-motions.  See Docket Entry #64, Memo. of Law in Opp.

## III.    Discussion

### A.    Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court should grant summary judgment for a movant when he or she "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Celotex Corp.

---

[10]  Colonial, in opposition to Synagro's motion, merely relies on the evidence and arguments put forward by Mace.  Therefore, the Court's analysis will refer only to Mace's arguments in opposition.

v. Catrett, 477 U.S. 317, 320-23 (1986); Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 250 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." Celotex, 477 U.S. at 323-324.

The threshold inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact. See Anderson, 477 U.S. at 248. A court should look to the relevant substantive law to "identify which facts are material." Id. A fact is "material" if it "might affect the outcome of the suit under the governing law[; f]actual disputes that are irrelevant or unnecessary will not be counted." Id. A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. Restated, a genuine dispute over a material fact is one "that might affect the outcome of the suit under the governing law." Id. That both sides of an action are simultaneously moving for summary judgment does not establish that there is no genuine issue of material fact. 10A C. Wright, A. Miller, M. Kane, R. Marcus, A. Steinman, Federal Practice and Procedure § 2720 (3d ed. 2010).

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) (citing Celotex, 477 U.S. at 323-24), and that he or she "is entitled to judgment as a matter of law." Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc., 473 F.3d 450, 455 (2d Cir. 2007) (internal quotation marks and citation omitted). If satisfied, the burden then shifts to the non-movant to present evidence establishing "that there is a genuine issue of material fact." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986). To defeat the motion, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586. Moreover, a non-movant may not defeat a motion for summary judgment on the basis of

13

"conclusory allegations or unsubstantiated speculation," Fujitsu Ltd. v. Fed. Exp. Corp., 247

F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted); Carey v. Crescenzi,

923 F.2d 18, 21 (2d Cir. 1991). Instead, the non-movant must establish the existence of an issue

of fact by showing that "there is sufficient evidence favoring the nonmoving party for a jury to

return a verdict for that party," Anderson, 477 U.S. at 249. If the non-movant fails to satisfy his

or her burden, judgment for the movant is appropriate because, based upon the facts before the

Court, there can be only one reasonable conclusion as to a verdict. Cruden v. Bank of New

York, 957 F.2d 961, 975 (2d Cir. 1992).

> Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules
> of Civil Procedure, there shall be annexed to the notice of motion a separate, short
> and concise statement, in numbered paragraphs, of the material facts as to which the
> moving party contends there is no genuine issue to be tried. Failure to submit such
> a statement may constitute grounds for denial of the motion.

Local Civ. R. 56.1(a). The papers opposing a motion for summary judgment shall include a

correspondingly numbered paragraph responding to each numbered paragraph in the statement

of the moving party, and if necessary, additional paragraphs containing a separate, short, and

concise statement of additional material facts as to which it is contended that there exists a

genuine issue to be tried. Local Civ. R. 56.1(b). "Each statement by the movant or opponent

pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of

material fact, must be followed by citation to evidence which would be admissible, set forth as

required by Fed. R. Civ. P. 56(c)." Local Civ. R. 56.1(c).

In the context of a motion for summary judgment, Fed. R. Civ. P. 56(c)(1) provides that a

party may support his or her version of the material facts by:

> (A) citing to particular parts of materials in the record, including depositions,
>      documents, electronically stored information, affidavits or declarations,
>      stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

While a "court need consider only the cited materials, . . . it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); see Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008).

When evaluating a summary judgment motion, a court should "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in its favor." Mount Vernon Fire Ins. Co. v. Belize NY, Inc., 277 F.3d 232, 236 (2d Cir. 2002); accord Farias v. Instructional Sys., Inc., 259 F.3d 91, 97 (2d Cir. 2001); see also Anderson, 477 U.S. at 261 n. 2. That means that "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Holcomb, 521 F.3d at 137. "When both sides have moved for summary judgment, each party's motion is examined on its own merits, and all reasonable inferences are drawn against the party whose motion is under consideration." Chandok v. Klessig, 632 F.3d 803, 812 (2d Cir. 2011). Further, in the event of cross motions for summary judgment, "the legal theories the movant advances in support of a Rule 56 motion and the assertion that there is no issue of material fact may not be used against the movant when the court rules on his adversary's motion." 10A C. Wright, A. Miller, M. Kane, R. Marcus, A. Steinman, Federal Practice and Procedure § 2720 (3d ed. 2010).

15

B.      **Synagro's Motion for Summary Judgment**

1.      **Breach of Contract Claim**

Synagro seeks summary judgment on its breach of contract claim against Mace, alleging that Mace breached the subcontract by failing to timely pay Synagro in full for Synagro's full performance under the subcontract.  Synagro seeks $137,885.44 in damages, late fees under the terms of the subcontract, and statutory interest.  See Docket Entry #56, Memo. of Law at 3.

a.      **Applicable Law**

In this diversity action, the parties' claims must be examined by reference to New York law.  To establish a breach of contract claim under New York common law, one must establish the existence of (1) an agreement, (2) sufficient performance by the plaintiff, (3) breach of the agreement by the defendant, and (4) damages resulting therefrom.  Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011).  "[T]he initial interpretation of a contract is a matter of law for the court to decide."  K. Bell & Assoc., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir.1996) (internal quotation marks and citation omitted).

As a threshold matter, a court must determine whether a contract's terms are ambiguous. Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, 136 F.3d 82, 86 (2d Cir. 1998).  An ambiguity exists within a contract when, reading the contract objectively, a reasonably intelligent person "could interpret the language in more than one way." Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008); Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2005).  " 'Ambiguity is determined by looking within the four corners of the document, not to outside sources,' "  Id. (quoting Kass v. Kass, 91 NY2d 554, 566 (1998) (Opn. By Kaye, Ch. J.)), and it "can arise either from the language itself or from inferences that can be drawn from this language."  Alexander, 136 F.3d at 86.  Specifically, the

16

court

> should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.  Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.  Form should not prevail over substance and a sensible meaning of words should be sought.

Kass, 91 NY2d at 566 (internal quotation marks and citation omitted).  "Where a written agreement between sophisticated, counseled businessmen is unambiguous on its face, one party cannot defeat summary judgment by a conclusory assertion that, owing to mutual mistake or fraud, the writing did not express his own understanding of the oral agreement reached during negotiations."  Chimart Assoc. v. Paul, 66 NY2d 570, 571 (1986) (Opn. by Kaye, J.).

Interpretation of an unambiguous contract is an issue of law left to the court, and, in such a context, the court's primary responsibility to "give effect to the intent of the parties as revealed by the language of their agreement."  Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157 (2d Cir. 2000)(Opn by Sotomayor, J.); Chapman v. New York State Div. of Youth, 546 F.3d 230, 236 (2d Cir. 2008); Teitelbaum Holdings v. Gold, 48 NY2d 51, 56 (1979).  Therefore, "[w]hen the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity."  Seiden Assoc., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (1992); Topps, 526 F.3d at 68; Fischer, 632 F.3d at 799 ("Summary judgment is appropriate if the terms of the contract are unambiguous.").  "[M]atters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument."  Teitelbaum, 48 NY2d at 56.  "Where the document makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement."  Kass, 91 NY2d at 567

17

(internal quotation marks, brackets, and citation omitted).

Where, however, there is ambiguity in the language of a contract, the question of interpretation is usually left to the finder of fact.  Compagnie, 232 F.3d at 158.  Typically, "[w]here the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is inappropriate."  Seiden Assoc., 959 F.2d at 428; Allianz, 416 F.3d at 113 ("A contractual ambiguity generally renders summary judgment inappropriate in a breach of contract action"); Alexander, 136 F.3d at 86; Brass v. American Film Technologies, Inc., 987 F.2d 142, 149 (1993).  Such rule, however, is not absolute; a "court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary."  Compagnie, 232 F.3d at 158 (internal quotation marks and citation omitted).

**b.    Synagro's Claim**

Here, there is no dispute that Synagro and Mace entered into the subcontract at issue, Docket Entry #47, Mace's Rule 56.1 Statement at ¶ 31, which states that "Synagro [is] to provide the following: All equipment and personnel needed to clean, dewater, [t]ransport and dispose of the residuals in the two oxygen aeration tanks at the New Rochelle Wastewater Treatment Plant."  Docket Entry #54, Exh. 13, Agreement for Professional Services.  The subcontract sets forth the following "Schedule of Charges:"

| | |
|---|---|
| Gaskets | $900.00 each as needed |
| Mobilization and Demobilization: | $9,250.00 |
| Processing, Trucking and Disposal of 1600 wet tons: | $320,000.00 |
| Processing[,] Trucking and [D]isposal of over 1600 wet tons: | $200.00 per wet ton |

Id.  It notes that "Mace Contracting is guaranteeing a quantity of no less than 1600 tons of

residuals."  Id.  The May 14, 2009, letter proposal, which the subcontract incorporates by

reference, makes clear that Synagro was responsible for "the removal, dewatering, transportation

and disposal of the residuals from [the] oxygenation tanks."  Docket Entry #54, Attach. 13, May

14, 2009, Dean Letter.  In addition, it sets forth the same pricing structure as the subcontract,

except that it does not list a lump sum amount of $320,000 for 1,600 tons of grit residue, instead

stating that Synagro will process, transport, and dispose of the grit residue for "$200 per wet

ton."  Id.  The letter proposal, however, provides: "As discussed we are basing our price and will

bill for a minimum tonnage of 1600 wet tons."  Id.

Neither Mace nor Colonial dispute that Synagro fully performed under the subcontract as

written in that Synagro removed, dewatered, and disposed of the entirety of the grit residue,

which the parties agree totaled between 564 and 566 dewatered tons.  Docket Entry #47, Mace's

Rule 56.1 Statement at ¶¶ 37, 39; Docket Entry #54, Synagro's Rule 56.1 Statement at ¶ 45.

Further, neither party disputes that, under the language of the subcontract, such performance

entitled Synagro to $320,000 for the handling the residue, as well as $9,250 for mobilization and

demobilization.  The parties agree that Mace has paid Synagro a total of $206,615.25 on the

subcontract.  Docket Entry #54, Exh. 14, All Transactions; Docket Entry #63, Exh. A, Blaise

Trans. at 83.  Therefore, Synagro has prima facie established its entitlement to summary

judgment as to liability on its breach of contract claim against Mace, thereby shifting the burden

to Mace to establish a genuine issue of material fact on the claim.  See Celotex, 477 U.S. at

323-24; Holcomb, 521 F.3d at 137.

      **c.**     **Mace's Claim of Contractual Ambiguity**

Rather than dispute Synagro's breach of contract claim as stated, Mace argues that

material terms of the subcontract are ambiguous.  Specifically, Mace alleges that the subcontract

contains ambiguities concerning (1) the quantity of grit residue in the oxygenation tanks; (2) the

physical composition of the grit residue; and (3) the means and methods that Synagro was to

employ to remove, dewater, and dispose of the grit residue.  See Docket Entry #58, Mace's Mem.

in Opp. at 2.  According to Mace, such ambiguities concern material terms to the subcontract,

necessitating resort to extrinsic evidence, which, consequently, precludes summary judgment.

See id.  Mace further argues that such extrinsic evidence makes clear that the subcontract was

meant to reflect a certain amount and composition of grit residue, and that a belt press was

required to dewater such residue.  See id. at 3-4.  It contends that "the Contract should be

construed to include the belt press machine and Synagro's representations about the composition

of the Grit Residue," id. at 4, and, "[s]ince Synagro did not perform the Contract using the belt

press machine that it erroneously assumed would dewater the [g]rit [r]esidue, Synagro is unable

to demonstrate performance under the Contract that would sufficiently give rise to a claim for

breach of contract."  Id.

　　　The subcontract, which was executed on June 11, 2009, incorporated Synagro's May 14,

2009, letter proposal, indicating that the parties negotiated the terms of the agreement over the

span of approximately one month.  Although the subcontract did not specify the number of

dewatered tons of grit residue present in the oxygenation tanks, it provided a clear billing

structure applicable no matter the amount of residue present.  Specifically, the subcontract and

the May 14, 2009, letter proposal both stated that Mace would pay Synagro $200 for each

dewatered ton of grit residue that it handled.  The subcontract "guarantee[d] a quantity of no less

than 1600 tons."  Docket Entry #54, Exh. 13, Agreement for Professional Services.  Inasmuch as

Mace argues that such phrases, standing alone, are ambiguous, they are clarified by the

proposal's statement that Synagro "will bill for a minimum tonnage of 1600 [dewatered] tons."

Docket Entry #63, Exh. D, May 14, 2009, Dean Letter.  Taken together, it is clear that Mace

guaranteed the presence of at least 1,600 dewatered tons of grit residue in the oxygenation tanks,

and, in the event that a lesser amount was present, Mace would pay Synagro for the removal of

1,600 dewatered tons.  Such reading of the documents is reinforced by the "Schedule of

Charges" contained in the subcontract, which states a lump sum charge of $320,000 for the

"Processing, Trucking and Disposal of 1600 [dewatered] tons."  Docket Entry #54, Exh. 13,

Agreement for Professional Services.  The subcontract contained a separate billing provision for

any grit residue in excess of the guaranteed 1,600 tons, stating that Mace would pay "$200 per

[dewatered] ton" for any "Processing[,] Trucking and disposal over 1600 [dewatered] tons."  Id.

The only reasonable construction of such terms is that Mace promised to pay Synagro $320,000

for the removal, dewatering, and disposal of up to 1,600 dewatered tons of grit residue.  For any

amount of residue beyond 1,600 tons, Mace agreed to pay Synagro $200 per dewatered ton.

Consequently, the "contract has a definite meaning, and . . . no reasonable basis exists for a

difference of opinion about that meaning."  Brass, 987 F.2d at 149.

Similarly, the subcontract contains no ambiguity as to the physical composition of the

grit residue or the means and methods that Synagro was to use for its removal, dewatering, and

disposal.  Neither the subcontract nor the integrated letter proposal make any reference to the

residue's composition.  As to the means and methods to be used, the letter proposal and the

subcontract only require Synagro to provide the personnel and equipment necessary to perform

the work.  Docket Entry #63, Exh. D, May 14, 2009, Dean Letter; Docket Entry #54, Exh. 13,

Agreement for Professional Services.  Such terms left Synagro with the responsibility of

evaluating the composition of the grit residue and utilizing the methods necessary to handle the

residue based upon its composition.  A contract that sets forth only performance specifications is permitted under the law, and it "requires a contractor to produce a specific result without specifying the particular method or means of achieving that result." Fruin-Colnon Corp. v. Niagara Frontier Transp. Auth., 180 AD2d 222, 229 (4th Dept. 1992).  Such a contract gives the contractor freedom to "choose the materials, methods and design necessary to meet the objective or standard of performance." Id.  That the subcontract at issue did not detail the grit residue composition or the means and methods to be utilized does not leave the agreement open to more than one interpretation.  Instead, it makes clear that such variables were to be handled by Synagro in its performance, and, therefore, the terms were not ambiguous.  See Topps, 526 F.3d at 68; Allianz, 416 F.3d at 113.

        **d.**      **Mace's Claim of Vagueness**

Mace also contends that the subcontract should be voided for vagueness, claiming that it was unenforceable because it "contain[ed] no reference to the specific means and methods for performing the Grit Residue operation, [did not] accurately incorporate the estimated quantities contained in the County specifications, [and did not] discuss the composition of the subject Grit Residue." Docket Entry #58, Mace's Mem. in Opp. at 6-7.  "If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp., 74 NY2d 475, 482 (1989); see Martin Delicatessen v. Schumacher, 52 NY2d 105, 109 (1981).  "[U]nless a court can determine what the agreement is, it cannot know whether the contract has been breached, and it cannot fashion a proper remedy." Cobble Hill, 74 NY2d at 482.  Further, "the requirement of definiteness assures that courts will not impose contractual obligations when the parties did not intend to conclude a binding agreement." Id.

The stated omissions do not render the subcontract so vague that it is legally unenforceable. While the subcontract did not detail the amount of grit residue in the oxygenation tanks, it did, as discussed supra, set forth a definite billing structure sufficient for execution of the subcontract no matter the amount of residue present. In addition, although the subcontract did not set forth the composition of the grit residue or the means and methods to be utilized, the terms were sufficiently clear for the parties to understand their obligations under the subcontract. Specifically, such omissions makes clear that Synagro was to evaluate the residue's composition and decide upon the proper means and methods at the time of performance.

**e.     Mace's Claim of Mutual Mistake**

Mace also seeks to defeat Synagro's breach of contract claim on the basis of mutual mistake. Specifically, Mace asserts that the written subcontract was subject to the following mutual mistakes: "the quantity of Grit Residue was misstated, the means and methods were omitted and the composition of the tested Project samples were left out of the agreement." Docket Entry #58, Mace's Memo. of Law in Opp. at 8.

A mutual mistake by the parties to a contract may provide an equitable basis for reforming or rescinding a written agreement. A mutual mistake exists where the parties to a bilateral contract have reached an oral agreement and, unknown to either, the signed writing does not in fact express the parties' meeting of the minds as to a material assumption of the agreement. Chimart, 66 NY2d at 573; Healy v. Rich Products Corp., 981 F.2d 68, 73 (2d Cir. 1992) (citing 21 N.Y. Jur.2d Contracts § 121 (1982)); Janowitz Bros. Venture v. 25-30 120th St. Queens Corp., 75 AD2d 203, 214 (2d Dept. 1980). "Neither side should profit from a mistake jointly perceived and acted upon," and, therefore, "[w]here the mistake is both mutual and substantial, . . . there is absence of the requisite 'meeting of the minds' to contract." D'Antoni v.

Godd, 52 A.D.2d 973, 974 (3d Dept. 2008).  However, "reformation based upon mistake is not available where the parties purposely contract based upon uncertain or contingent events." Chimart, 66 NY2d at 574.

To obtain relief from a contract on the basis of mutual mistake, a party must show that the mistake is one that "is mutual, substantial, material and exists at the time the contract is entered." Rodriguez v. Mower, 56 AD3d 857, 858 (3d Dept. 2008).  "[T]here is a heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties." Chimart, 66 NY2d at 574 (internal quotation marks, brackets, and citations omitted).  "Because the thrust of a reformation claim is that a writing does not set forth the actual agreement of the parties, generally neither the parol evidence rule nor the Statute of Frauds applies to bar proof, in the form of parol or extrinsic evidence, of the claimed agreement." Chimart, 66 NY2d at 573.  Consequently, a mutual mistake argument creates "the danger that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a different, oral contract." Id.  Accordingly,

> proof of [mutual] mistake must be "of the highest order," [and it] must "show clearly and beyond doubt that there has been a [mutual] mistake" and . . . must show with equal clarity and certainty "the exact and precise form and import that the instrument ought to be made to assume, in order that it may express and effectuate what was really intended by the parties."

Janowitz, 75 AD2d at 215 (quoting 13 Williston, Contracts § 1548 at 125 (3d ed)); see Chimart, 66 NY2d at 574; Amend v. Hurley, 293 NY 587, 595 (1944) ("Reformation may not be granted upon a probability nor even upon a mere preponderance of evidence, but only upon a certainty of error.").

Upon a showing of mutual mistake, rescission or reformation of the contract may be available. See Gould v. Board of Educ. of Sewanhaka Cent. High School Dist., 81 NY2d 446,

24

453 (1993) (Generally, when a written contract was entered into under a mutual mistake of fact, the agreement "is voidable and subject to rescission."); George Backer Mgt. Corp. v. Acme Quilting Co., 46 NY2d 211, 219 (1978) ("Reformation is not granted for the purpose of alleviating a hard or oppressive bargain, but rather to restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties."). Rescission is generally only available when the contract is still executory or the parties may be returned to the status quo. See D'Antoni, 52 AD2d at 974.

A unilateral mistake, which occurs when only one party to a bilateral agreement is in error, will not justify reformation or rescission of a contract absent fraud. Healy, 981 F.2d at 73; Janowitz, 75 AD2d at 214; Albany Discount Corp. v. Basile, 32 AD2d 723, 724 (3d Dept. 1969). Therefore, a party that holds superior knowledge over one on the opposite side of a bargaining table has no duty to disclose such knowledge simply because of their positions. Brass, 987 F.2d 142, 150. The duty to disclose such information arises only when it is "not readily available to the other, and [the party with superior knowledge] knows that the other is acting on the basis of mistaken knowledge." Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n., 731 F.2d 112, 123 (2d Cir.1984); see Young v. Keith, 112 AD2d 625, 627 (3d Dep't 1985).

It is uncontested that the subcontract at issue was negotiated by sophisticated parties, each of which held relevant knowledge and negotiated at arm's length. Thus, there is a presumption that the written contract reflects the intent of Synagro and Mace. See Chimart, 66 NY2d at 574. However, as stated previously, the Court must look to extrinsic evidence to evaluate the merit of Mace's mutual mistake claims. See id. at 573.

Mace supports its argument with, among other things, a copy of the pleadings, excerpts of the paperwork underlying Mace's contract with the County, a copy of the subcontract between

25

Synagro and Mace, the transcripts of the depositions of Blaise and Callahan, and an affidavit by Blaise. Docket Entries #44-45, 68. In response, Synagro submitted an affidavit by Callahan. Docket Entry #63, Exh. C, Callahan Affidavit.

The Court initially looks to the transcript of the deposition of Callahan. Each of Synagro's bids included the use of a belt press, Callahan explained, because "[t]ypical waste water treatment plant cleanings are done with some type of dewatering equipment," Docket Entry #68, Callahan Trans. at 19, and dewatering was specifically called for here. Callahan testified that Mace did not suggest the use of any particular equipment, and Synagro determined, based on its experience, what equipment was appropriate for the work. Id. at 29. Callahan explained that, although there are "a variety of ways to dewater" grit residue, id. at 23, Synagro's only dewatering equipment consisted of centrifuges and a belt press. Callahan attested that based upon County's description of the grit residue as sludge containing sand particulate, grease, water, and mixed liquor, he believed a belt press would work best. Id. at 22-24.

As to Synagro's original calculations on the project, Callahan stated that because he could not take a sample of the residue, he based Synagro's first estimates of the project's costs on the 1,600 dewatered tons set forth in the County's specifications and "just kind of calculated what we would need to do, as far as equipment, personnel, and came up with a number for" Mace. Id. at 12, 14, 31.[11]

Callahan's testimony then turned to Synagro's February 2009 bid on the project, in which it offered to remove, dewater, and dispose of the grit residue for $300 per dewatered ton.

---

[11] In his deposition testimony, Callahan appears to refer to this original calculation as a proposal separate from the February, 2009, and May, 2009, bids submitted to Mace by Synagro. Because Callahan later states in his deposition testimony that Synagro only submitted two bids, it is unclear if this earlier calculation was ever submitted to Mace in the form of a bid.

Callahan stated that he did not base the rate of $300 per dewatered ton upon the County's specification of 1,600 tons, explaining that he did not actually expect there to be 1,600 dewatered tons of grit residue in the oxyengation tanks. See id. at 32. According to Callahan, Synagro instead based its proposal upon the assumption that the tanks would contain 800 dewatered tons of residue, explaining: "We didn't feel comfortable with the 1,600 ton number. It's not financially sound to go ahead and bid a job at specifications that say it's got 1,600 tons when experience tells us that specifications quantities are usually higher than actual quantities." Id. at 36.

Callahan stated that after Mace rejected the proposal as too expensive, Synagro considered proposing to do the work for $200 per dewatered ton. See id. at 62. However, prior to submitting a revised proposal, Callahan needed to sample the grit residue and estimate its volume in order to ascertain whether Synagro could afford to do the work for $200 per dewatered ton. See id. at 63. Callahan was thereafter permitted to take a sample of the grit residue from the oxygenation tanks, id. at 16, 62, and he described the process as follows:

> I met Vladimir and James on site and got a sample and sent it off to my lab in Baltimore. And through the calculations that the lab in Baltimore did on the material, we actually calculated 1,100 tons to be the most material in those tanks. We couldn't be 100 percent positive because material may slope. We went with the average depth at that time.

Id. at 38. Upon further questioning, Callahan stated that he based the May 2009 proposal on the assumption that the tanks contained between 800 and 1,100 dewatered tons of grit residue. See id. at 69. He explained the process by which Synagro and Mace negotiated the subcontract:

> Q.    You've done the testing and you came up with your calculations and you estimated that there were no more than, or was it at least?
>
> A.    No more than 1,100 was what I went with as my high number.

Q.      Did you have an at least number?

A.      Did we have a minimum?  We were sticking at 800 as the minimum because that's what we originally went with.

Q.      Explain to me again how you came up with the minimum of 800.

A.      We just picked a number, honestly.  It's a known fact, in our experience, that the volumes are not there that are listed in the specifications.

Q.      Would it be a coincidence that the 800 is exactly half of 1,600?

A.      It could have been.  It could have been we'll go with 50 percent of the volume and let's figure it from there.

Q.      When you submitted the bid, there was a range you were comfortable with between 800 and 1,100?

A.      The second bid, yes.

Q.      Based upon that, was there a change in the bid?

A.      Yes.

Q.      And how was the bid changed?

A.      It was discussed with Mace that there was, in our thoughts, no more than 1,100 [tons] in there.  They said they would guarantee us 1,600 . . . wet tons, in payment.  The numbers in the models were changed to 1,600 because that's what we were going to be paid for.  We left the same equipment, same number of days, same people, changed the numbers over on the pricing page. They should have been changed to 1,600 versus 800.

Q.      How was this information about 1,100 tons, but no more than, communicated to Mace?

A.      Through Anita Dean and myself when we had another meeting with them.

Q.      You discussed the bid with them and advised that these were your calculations?

A.      I discussed with Vladimir [Blaise], yes.

Id. at 66-68.  Callahan explained that "[f]or us to drop our price, [Mace] guaranteed us payment

on 1,600 tons." Id. at 69.

In an affidavit, Callahan reaffirmed that Synagro estimated the oxygenation tanks to contain approximately 1,100 dewatered tons of grit residue. Docket Entry #63, Exh. C, Callahan Affidavit at ¶ 5. In addition, Callahan again stated that there was no way to precisely measure the amount of residue present in the tanks prior to commencement of the project. See id. at ¶ 6.

Echoing his deposition testimony, Callahan stated that, in exchange for Synagro reducing its price to $200 per dewatered ton, Mace "offered to guarantee at least 1,600 [dewatered] tons of residuals." Id. at ¶ 8. He further explained that Mace guaranteed "a floor price $320,000.00, representing a minimum of 1,600 wet tons at the rate of $200/wet ton . . . Mace bore the risk if the volume was less than 1,600 wet tons." Id. at ¶ 9. Callahan explained that "[s]tructuring the price in this way made sense for Synagro because the $320,000 floor price provided for a sufficient profit margin in light of risks and the allocation of equipment, resources, and labor that would be utilized for the project." Id. at ¶ 10.

The Court next looks to an affidavit by Blaise, in which he explained that Synagro and the County's engineer informed him that a belt press was necessary for dewatering the grit residue. See Docket Entry #44, Blaise Affidavit at ¶ 18. Blaise stated that, based upon Synagro's expertise, Mace relied upon its representation that a belt press was necessary. Id. at ¶¶ 19, 27. He further explained that Mace accepted Synagro's bid to remove, dewater, and dispose of the grit residue because "Synagro was the only contractor that specialized in the grit residue operations requiring a belt press." Id. at ¶ 19. Blaise stated that Synagro's use of skid steers, rather than a belt press, to dewater the grit residue "substantially decreased the amount of time that Synagro was at the Project to four (4) days and resulted in a significant savings in the work that Synagro was obligated to perform under the Synagro Contract." Id. at ¶ 30.

29

Blaise then turned to the issue of the amount of residue in the tanks, acknowledging that "Callahan initially estimated that there was [sic] approximately 800 [dewatered] tons of [g]rit [r]esidue at the Project based upon his prior experience with similar tank operations for Synagro." Id. at ¶ 20.  He noted that, "[a]fter some testing, Mr. Callahan represented that the tanks could contain as much [sic] as 1100 [dewatered] tons of [g]rit [r]esidue." Id.  Blaise explained that rather than accept Callahan's calculations, he instead relied

> upon the County Specifications and the quantities contained in the Bid Proposal, in addition to other contract documents that provided there were between one (1) and two (2) feet of grit within the structure, in deciding that the quantity of wet tons that would actually be removed would not vary greatly from the 1600 wet tons specified by the County in agreeing to award Synagro the Grit Residue Project.

Id. at ¶ 24.  Blaise stated that "even though both parties were uncertain of the actual number of wet tons of [g]rit [r]esidue that would be removed from the tank or the precise composition thereof, Synagro inserted" the minimum tonnage requirement into the contract.  Id. at ¶ 25.

The Court next turns to the transcript of the deposition of Blaise, who testified that Mace hired Synagro because it was the only bidder able to dewater the grit residue as required by the contract with the County.  See Docket Entry #54, Attach. 5, Blaise Trans. at 32.  Blaise testified that, although Synagro was unable to use its belt press, it was able to timely complete the work.  Id. at 56.

Blaise detailed the negotiation of the subcontract, stating that Synagro "would do [the work] at $200 a ton, but needs to be guaranteed about 1600 tons." Id. at 38.  He reaffirmed that Mace "guarantee[d] a quantity of no less than 1600 tons of residuals," id. at 42, relying on the County's specifications, which indicated the presence of approximately 1,600 dewatered tons.  Id. at 45-46.  He added that Mace "had a contract price with Synagro where [it] guaranteed [that it] would pay [Synagro] based on $320,000 for 1,600 wet tons guaranteed by Mace," id. at 90,

but he stated "that was in the context of them being able to dewater this material." Id. at 91. Blaise explained that "[b]ased on the contract documents . . . , I thought would be probably close to the amount of tonnage." Id. at 92. He added that, based upon the one to two feet of residue in the tanks, an estimate of "1600 tons was within reason." Id. at 93.

Asked about Callahan's estimate of the grit residue in the tanks, Blaise testified that Callahan's method of measurement was "not really an accurate way" to ascertain the amount of sludge in the tanks, explaining that "[t]here is really no way to measure it" without shutting down the tanks. Id. at 95. When asked what Callahan estimated the amount of residue to be based upon its samples, Blaise stated that he could not recall, only that the results were "inconsistent." Id. at 96.

Mace first alleges that "[b]oth parties were fundamentally mistaken about the quantity of [g]rit [r]esidue that was to be removed under the governing agreement since both parties reasonably relied upon the estimated quantity that was contained in the Bid Proposal prepared by the County as the foundation for their agreement." Docket Entry #46, Memo. of Law at 7. It, however, acknowledges that, prior to entering into the contract, Callahan estimated that the tanks contained between 800 and 1,100 dewatered tons of residue. See id. at 4. Mace explains that, despite such knowledge, Synagro relied on the County's specification, stating that "although both parties relied upon the quantity contained in the Bid Proposal, Synagro had acquired field experience that enabled it to know that it was likely that the estimated quantity was likely greatly overstated." Id. at 4. Mace again notes that "both parties were uncertain of the actual number of wet tons of Grit Residue that would be removed from the tanks or the precise composition thereof." Id. at 4-5. It also essentially claims that it would be inequitable for Synagro to recover the full amount due under the subcontract because it only dealt with 566 dewatered tons of

31

residue. See id. at 6.

The deposition testimony and affidavit of Blaise provide limited proof that Mace mistakenly believed the tanks to contain 1,600 dewatered tons of residue, because such evidence indicates that Mace relied on that part of the County's specifications stating such amount when it entered into the subcontract with Synagro. See Blaise Trans. at 45-46; Docket Entry #44, Blaise Affid. at ¶ 24. However, Mace cites no admissible evidence to establish that, at the time that it entered into the subcontract, Synagro "shared the same erroneous belief," Healy, 981 F.2d at 73. Consequently, Mace fails to support its assertion that it and Synagro were mutually mistaken about the amount of grit residue present in the tanks.

Mace attempts to support its claim with citations to Callahan's deposition testimony in which Callahan stated that he based Synagro's initial cost calculations on the County's specifications. Docket Entry #69, Mace's Reply at 4-5; see Docket Entry #68, Callahan Trans. at 12-13. Such allegation, however, ignores Callahan's testimony that he based only his initial calculation upon the amount set forth in the County's specifications. Callahan testified that Synagro's February 2009 bid of $300 per dewatered ton was not based on the County's estimate because he "didn't feel comfortable with the 1,600 tons number," explaining that, "specifications quantities are usually higher than actual quantities." Id. at 36. According to Callahan, Synagro's February 2009 bid assumed the presence of only 800 dewatered tons. The uncontrovered deposition testimony of Callahan and Blaise establish that Synagro agreed to reduce its price in its May 2009 bid to $200 per dewatered ton in exchange for Mace guaranteeing payment to Synagro for 1,600 dewatered tons. Id. at 67-68; Docket Entry #54, Attach. 5, Blaise Trans. at 38, 42. The affidavit of Callahan provides further proof that Synagro did not rely on the County's specifications or believe that the oxygenation tanks contained anywhere near 1,600

dewatered tons of grit residue when entering into the subcontract insofar as Callahan stated that Synagro believed that the tanks contained no more than 1,100 tons of residue.  Docket Entry #63, Exh. C, Callahan Affid. at ¶ 5.  Accordingly, all of the evidence in the record shows that, when preparing the May 14, 2009, proposal, and when entering into the subcontract, Synagro believed, based upon the calculations of Callahan, that the oxygenation tanks contained no more than 1,100 dewatered tons of grit residue.  See Id.; Docket Entry #68, Callahan Trans. at 67-68.

        In addition, the language of the subcontract, as well as that of the incorporated May 14, 2009, letter proposal, do not support Mace's allegation of a mutual mistake as to the amount of grit residue.  Read alone, the provision of the subcontract that states Mace shall guarantee the presence of 1,600 tons of grit residue may be read to indicate that Mace and Synagro believed such amount of residue to be present in the tanks.  Similarly, the Schedule of Charges in the subcontract guaranteed Synagro payment of $320,000 for 1,600 dewatered tons, but it set a rate of $200 per ton for any residue in excess of the 1,600 tons.  Again, read alone, such clause may indicate that the parties expected the presence of 1,600 dewatered tons.  A court, however, "should construe a contract so as to give meaning to all of its language and avoid an interpretation that effectively renders meaningless a part of the contract."  Republic of Rwanda v. Ferone, 307 Fed. Appx. 600, 602 (2d Cir. 2009) (internal quotation marks and citation omitted); Westmoreland Coal Co. v. Entech, Inc., 100 NY2d 352, 358 (2003) (A written instrument must be "read as a whole, and every part [must] be interepreted with reference to the whole.").  Synagro's May 14, 2009, letter proposal stated that it was "basing our price and will bill for a minimum tonnage of 1600 wet tons."  Docket Entry #54, Exh. 12, May 14, 2009, Dean Letter.  Such phrase acts as a payment floor, indicating that Synagro would bill Mace for such minimum amount no matter the amount of residue actually present.  The presence of such clause

indicates that the parties were aware that the tanks could contain less than 1,600 dewatered tons of residue, further establishing that there was no mutual mistake.

Even assuming that Mace actually relied on the County's estimate that the tanks contained 1,600 dewatered tons of grit residue, such a belief would have constituted merely a unilateral mistake; it would not be a basis for relief, because such mistake was not accompanied by fraud. See Healy, 981 F.2d at 73. The affidavit of Blaise, and the deposition testimony of Callahan, establish that, prior to formation of the subcontract, Callahan notified Mace that he believed that the tanks contained no more than 1,100 dewatered tons of residue. Docket Entry #68, Callahan Trans. at 67-68; Docket Entry #44, Blaise Affid. at ¶ 20. Thus, Synagro met its obligation to disclose its superior knowledge. Aaron, 731 F.2d at 123.

Mace's decision to rely on the County's estimate appears foolish in light of Mace's assertion, in its Amended Answer that "[r]eplete throughout the County Specification, the County cautioned that the quantity was an approximate estimate only." Docket Entry #30, Amended Answer at 6-7. Further, in its Memorandum of Law in Support of its Motion for Summary Judgment, Mace acknowledges that "there was no way to test the actual quantity of [g]rit [r]esidue since both of the oxygenation tanks were sealed," and, therefore, "[b]oth Mace and Synagro bore the risk that the tanks would yield either a higher or lower yield of Grit Residue than the 1600 wet ton figure specified by the County, and each party assumed the risk concerning the estimated quantity in entering into the Synagro Contract." Docket Entry #46, Mace's Memo. of Law at 11. Relief is not available on the basis of mistake because the parties entered into the contract on the known assumption of a doubtful fact, see Gerard v. Almouli, 746 F.2d 936, 939 (2d Cir. 1984), and they made provision in case such fact did not come to fruition. See Sears v. Grand Lodge A.O.U.W. of New York, 163 NY 374, 378-79 (1900). "A party bears

34

the risk of a mistake when . . . (b) he [or she] is aware, at the time the contract is made, that he

[or she] has only limited knowledge with respect to the facts to which the mistake relates but

treats his [or her] limited knowledge as sufficient."  Restatement (Second) of Contracts § 154;

see P.K. Development, Inc. v. Elvem Development Corp., 226 AD2d 200, 201-02 (1st Dept.

1996).  Mace's decision to disregard Callahan's measurement and, instead, rely on the County's

estimate constitutes nothing more than an error in business judgment, which is not a basis for

rescission or reformation of the agreement.  See Backer, 46 NY2d at 219; Amend, 293 NY at

595 (a party to a contract may not "secure reformation merely upon a showing that he [or she] or

his [or her] attorney made a mistake.").  Such errors are the basis of our capitalist system "for

under New York law the ancient rule of caveat emptor is still alive and well."  Brass, 987 F.2d

142, 150; see Schultz v. 400 Co-op Corp., 292 AD2d 16, 20 (1st Dept 2002) ("Equity will not

relieve a party of its obligations under a contract merely because subsequently, with the benefit

of hindsight, it appears to have been a bad bargain" (internal quotation marks and citation

omitted)).

  In sum, the record is devoid of evidence that, at the time of entering into the subcontract,

Synagro and Mace operated under a substantial mutual mistake as to the amount of grit residue

in the oxygenation tanks.  See Rodriguez, 56 AD3d at 858; Yurman Design, Inc. v. Garden

Jewelry Mfg. Corp., 2003 WL 22047896, *3 (S.D.N.Y. 2003) ("A claim for rescission of a

contract based on mutual mistake must be dismissed if the parties do not share a substantially

similar erroneous belief as to the facts").  Moreover, Mace puts forth no evidence to "show with

equal clarity and certainty the exact and precise form and import that the instrument ought to be

made to assume."  Janowitz, 75 AD2d at 215 (internal quotation marks and citation omitted).

All of the evidence submitted shows that Synagro did not rely on the County Specifications or

expect the oxygenation tanks to contain anywhere near 1,600 dewatered tons of grit residue.  The uncontroverted proof further establishes that Synagro notified Mace that it did not believe there to be more than 1,100 tons of dewatered grit residue present in the tanks.   Docket Entry #68, Callahan Trans. at 67-68; Docket Entry #44, Blaise Affid. at ¶ 20.  Consequently, "there is no unequivocal evidence of mutual mistake or fraud." <u>Chimart</u>, 66 NY2d at 574; <u>see</u> <u>Backer</u>, 46 NY2d at 217.  Mace essentially concedes as much in its reply papers, where it states: "Synagro . . . mistakenly seeks to enforce a guarantee for a minimum quantity of [g]rit [r]esidue that Synagro's employee kn[e]w, at the time the Contract was entered into, was grossly misstated." Docket Entry #69, Mace's Reply at 2.

Mace also claims that it and Synagro were mutually mistaken about the composition of grit residue and the equipment necessary to remove and dewater the residue.  Mace alleges that both parties believed that the grit residue was of such a composition as to require the use of a belt press. <u>See</u> Docket Entry #46, Memo. of Law at 9.  Mace asserts that it accepted Synagro's bid at the rate of $200 per dewatered ton of grit residue because "Synagro was the only contractor Mace found that specialized in grit residue operations with a belt press, and Synagro represented that the belt press was required to dewater the Grit Residue in accordance with the means and methods provided in the County Specifications." <u>Id.</u> at 4.  It therefore seeks rescission of the subcontract or reformation of the document to include the necessity of a belt press based upon the expected composition of the residue.  In its reply papers, Mace, however, seems to undercut its own argument, where it makes the puzzling assertion that "Synagro should not be penalized for its flawed representations concerning quality and composition of the Grit Residue that resulted in Mace's agreement to utilize Synagro's belt press to perform the Project operation."  Docket Entry #69, Mace's Reply at 3.

As previously noted, the subcontract at issue details only performance specifications, meaning that it "requires a contractor to produce a specific result without specifying the particular method or means of achieving that result." Fruin-Colnon Corp. v. Niagara Frontier Transp. Auth., 180 AD2d 222, 229 (4th Dept. 1992). Such an agreement gives the subcontractor freedom to "choose the materials, methods and design necessary to meet the objective or standard of performance." Id. Synagro's incorporated May 2009 letter proposal states that Synagro will be responsible for "the removal, dewatering, transportation, and disposal of the residuals from oxygenation tanks." Docket Entry #54, Exh.12, May 14, 2009, Dean Letter. The subcontract itself echoed such statement, detailing only the performance specification to be achieved. Docket Entry #54, Exh. 13, Agreement for Professional Services. "[S]o long as a contractor produces work which satisfies the specifications, he [or she] can, in the interest of economy, choose his [or her] own methods . . . for when a contractor bids, his [or her] estimates, which influence the bid, are necessarily based on his [or her] own methods of work, so long as those methods are not controlled by the specifications." Rosoff Bros., Inc. v. State, 39 AD2d 974, 975 (3d Dept. 1972).

Here, these sophisticated parties negotiated an arm's length contract providing only a performance specification. Mace fails to establish a mutual mistake because it puts forth no evidence that performance of the contract was dependent on a specific composition of the grit residue. Moreover, Mace does not assert and provides no evidence that Synagro failed to satisfy the specifications of the subcontract. It basically alleges that Synagro may have found a more efficient way to perform the work, resulting in larger profits. Unhappy with such additional profit, Mace attempts to force new terms into the subcontract under the guise of a mutual mistake.

**f.    Conclusion on Liability**

In sum, Synagro has established that no genuine issue of material fact exists and that it is entitled to summary judgment on the issue of liability on its breach of contract claim against Mace. See Fed. R. Civ. P. 56(a); see also Celotex, 477 U.S. at 320-23; Anderson, 477 U.S. at 250. In response, Mace has failed to put forward evidence, and the record is devoid of any evidence, to establish the existence of a genuine issue of material fact on the breach of contract claim. Further, Mace failed to show the existence of a mutual mistake. Accordingly, Synagro is entitled to summary judgment on the issue of liability on its breach of contract claim against Mace.

**g.    Damages**

As to the issue of damages, Synagro has established that it performed work supporting bills for $329,250.00 under the subcontract for its handling of the residuals and its mobilization and demobilization. In light of Mace's payments to Synagro for $206,615.25, Synagro has prima facie established its entitlement to summary judgment on the issue of damages in the amount of $122,634.75, excluding any late fees or statutory interest. Synagro claims that it is actually entitled to $344,501.94 under the subcontract, but it has submitted no admissible evidence to account for the additional $15,251.94 that it seeks to collect. Consequently, the Court finds that a genuine issue of material fact exists as to Synagro's claim of entitlement to damages in excess of $122,634.75, excluding late fees and statutory interest.

**2.    Dismissal of Mace's First and Second Counterclaims and Fourth and Fifth Affirmative Defenses**

Synagro also moves for dismissal of Mace's first and second counterclaims for declaratory relief that the subcontract is invalid or should be reformed on the basis of the mutual

mistake arguments discussed above.  See Docket Entry #56, Synagro's Mem. of Law at 5-10.  It further seeks dismissal of Mace's affirmative defenses of mutual mistake.  As previously discussed, Synagro has established the validity of the subcontract, and the record contains sufficient admissible evidence showing that, as a matter of law, no mutual mistake existed.  Mace, even construing all evidence and ambiguities in its favor, fails to respond with sufficient admissible evidence to create an issue of fact on its counterclaims and affirmative defenses asserting mutual mistake.  Therefore, Synagro is entitled to summary judgment dismissing Mace's first and second counterclaims as well as its fourth and fifth affirmative defenses.

### 3.      Dismissal of Mace's Counterclaim for Unjust Enrichment

Synagro also seeks summary judgment dismissing Mace's third counterclaim, which is based upon a theory of unjust enrichment.  Docket Entry #56, Synagro's Mem. of Law at 13-14.  In its counterclaim, Mace asserted that Synagro's modified plan for the removal of the grit residue, which was necessitated by the failure of the belt press, "substantially decreased the amount of time that Synagro was at the Project to four (4) days and resulted in a significant savings in the work that Synagro was obligated to perform under the Synagro Contract."  Docket Entry #44, Mace's Memo. of Law at 5.  In New York, a claim for unjust enrichment lies in quasi-contract, and "is an obligation the law creates in the absence of any agreement."  Goldman v. Metropolitan Life Ins. Co., 5 NY3d 561, 587 (2005).  Specifically, the subcontract stated that Synagro was to provide "[a]ll equipment and personnel needed to clean, dewater, [t]ransport and dispose of the residuals."  Docket Entry #54, Exh. 13, Agreement for Professional Services.  Because the agreement discussed the issue of equipment needed for the project, even though it did not specifically mention the belt press, this dispute falls within the terms of the subcontract, which the Court has already determined to be valid, and, therefore, Mace's claim for unjust

enrichment is invalid.  See id.; Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co., 70 NY2d 382, 388

(1987) ("The existence of a valid and enforceable written contract governing a particular subject

matter ordinarily precludes recovery in quasi contract for events arising out of the same subject

matter").  Moreover, Mace, through its Reply papers, demonstrated an intent to withdraw such

claim, stating: "Mace willingly concedes that: . . . Synagro should be entitled to retain the extra

profit and savings in equipment and manpower that resulted from the change in the method of

removing the Grit Residue"  Docket Entry #69, Mace's Reply at 3.  Accordingly, Synagro is

entitled to summary judgment dismissing Mace's counterclaim for unjust enrichment.

> **4.**     **Dismissal of Mace's Counterclaim for Breach of the Covenant of Good Faith
> and Fair Dealing**

Synagro also moves for summary judgment dismissing Mace's counterclaim for breach of

the covenant of good faith and fair dealing, arguing that Mace fails to state a claim.  Mace's

Amended Answer states that "[b]y virtue of its actions and/or omissions detailed herein, Synagro

sought to deprive Mace of the benefits of the terms and conditions of the Synagro Agreement."

Docket Entry #30, Mace's Amended Answer at 10.

New York law imposes "in all contracts . . . a covenant of good faith and fair dealing in

the course of contract performance," Dalton v. Educational Testing Service, 87 NY2d 384, 389

(1995), which holds that "neither party to a contract shall do anything which has the effect of

destroying or injuring the right of the other party to receive the fruits of the contract." Thyroff v.

Nationwide Mut. Ins. Co., 460 F.3d 400, 407 (2d Cir.2006) (citation omitted); Carvel Corp. v.

Diversified Management Group, Inc., 930 F.2d 228, 230 (2d Cir.1991).  The "implied obligation

is in aid and furtherance of other terms of the agreement of the parties.  No obligation can be

implied, however, which would be inconsistent with other terms of the contractual relationship."

Murphy v. American Home Products Corp., 58 NY2d 293, 304 (1983).

Here, Synagro accurately notes that Mace's Amended Answer, Docket Entry #30, does not allege that Synagro took any action that "destroy[ed] or injur[ed]" Mace's right "to receive the fruits of the contract." Thyroff, 460 F.3d at 407. Even construing all ambiguities in Mace's favor, it claims that, as a result of a mutual mistake, Synagro was overpaid approximately $80,000 on the subcontract. See Docket Entry #30, Mace's Amended Answer at 8. It, however, alleges no wrongdoing on the part of Synagro. Thus, Synagro has met its initial burden of establishing no material disputed fact issue.

In response, Mace merely restates that Synagro received an overpayment of approximately $80,000 as a result of the two claimed mutual mistakes. See Docket Entry #46, Memo. of Law at 17. As stated above, such claim makes no allegation that Synagro acted in a way injurious to Mace, and, therefore, it does not properly state a claim for a breach of the covenant of good faith and fair dealing. See previous discussion at 31-37. Further, a search of the record before the Court reveals no evidence, even when construed in Mace's favor, sufficient to make out such a claim. Thus, Synagro is entitled to summary judgment dismissing Mace's counterclaim for breach of the covenant of good faith and fair dealing.

**5.    Collection on Colonial's Performance and Payment Bond**

Lastly, Synagro moves for summary judgment on its claim against Colonial as surety for Mace. Synagro seeks to hold Colonial liable, on the basis of the performance and payment bond, for the entirety of the amount due to it from Mace. Colonial, in opposition, incorporates by reference and asserts the same arguments put forward by Mace. See Docket Entry #59, Colonial's Memo. of Law at 1. The performance and payment bond executed by Mace and Colonial on Mace's contract with the County was required under New York State Finance Law

41

§ 137, which provides that, in order to enter into a public works contract with the County, a

contractor must obtain a "bond guaranteeing prompt payment of moneys due to all persons

furnishing labor or materials to the contractor or any subcontractors in the prosecution of the

work provided for in such contract."  New York State Finance Law § 137(1).  New York State

Finance Law § 137(5)(b) explains:

> "moneys due to persons furnishing labor to the contractor or his [or her]
> subcontractors" includes all sums payable to or on behalf of persons furnishing labor
> to the contractor or his [or her] subcontractors, for wages, health, welfare,
> non-occupational disability, retirement, vacation benefits, holiday pay, life insurance
> or other benefits, payment of which is required pursuant to the labor law or by the
> contract in connection with which the bond is furnished or by a collective bargaining
> agreement between organized labor and the contractor or subcontractor, and which
> are computed upon labor performed in the prosecution of the contract.

The parties do not dispute that the bond at issue guarantees prompt payment to subcontractors,

such as Synagro, of any undisputed amounts for work performed in connection with the

subcontractor's work on the project.  Specifically, the bond provides, insofar as is relevant, that

> [a]ll persons who have performed labor or rendered services, as aforesaid, all
> Subcontractors, and all persons, firms, corporations, including materialmen and third
> persons, as aforesaid, furnishing work, labor, services, supplies and material under
> or in connection with [the contract between Mace and the County] or in or about the
> performance and completion thereof, shall have a direct right of action . . . against
> [Colonial].

Docket Entry #54, Exh. 5, Performance and Payment Bond at ¶ 2(a).[12]  Thus, although Synagro

is not a party to the bond, it is an intended beneficiary and, consequently, has standing to bring

suit thereunder.

　　　Section 137 provides subcontractors on public works projects who are not promptly paid

---

[12]  Where, as here, a performance and payment bond on a public works contract does not
specifically refer to the New York State Finance Law, it is deemed issued pursuant to section
137 and subject to the provisions thereof.  Morin v. Empiyah & Co., LLC, 389 F.Supp.2d 506,
512 n 7 (S.D.N.Y. 2005) (Opn. by Chin, J.).

by the contractor a private right of action:

> Every person who has furnished labor or material, to the contractor or to a
> subcontractor of the contractor, in the prosecution of the work provided for in the
> contract and who has not been paid in full . . . shall have the right to sue on such
> payment bond in his [or her] own name for the amount, or the balance thereof,
> unpaid at the time of commencement of the action.

New York State Finance Law § 137(3). "[P]ayment bonds reflect a strong policy of
safeguarding the efforts of suppliers of labor and materials and are to be liberally construed in
accordance with their remedial purpose." Graham Architectural Products Corp. v. St. Paul
Mercury Ins. Co., 303 F.Supp.2d 274, 283 (E.D.N.Y. 2004). A "bond issued pursuant to Section
137 is intended to guarantee payment for labor or material performed or provided in the
prosecution of the work provided for in such contract," Morin v. Empiyah & Co., LLC, 389
F.Supp.2d 506, 513 (S.D.N.Y. 2005) (Opn. by Chin, J.) (internal quotation marks and citations
omitted), and, accordingly, "[t]he statutory text is read into the instrument." Id. (citations omitted
in original). The liability of the surety on such a bond is measured by the liability of the insured.
See Venus Mech. v. Insurance Co. of N. Am., 245 AD2d 559, 559 (2d Dept. 1997).
Accordingly, Colonial's "liability under the payment bond is measured by [Mace's] liability."
Nouveau Indus. Inc. v. Liberty Mut. Ins. Co., 2011 WL 10901796 (S.D.N.Y. 2011). Because
Synagro has sought payment from Synagro for its services on the subcontract, and because
Synagro has not paid the full amount due for the services rendered on the subcontract, Synagro
has a claim against Colonial, as Mace's surety, for the amount due to Synagro on the subcontract.

Here, as discussed supra, Synagro is entitled to summary judgment against Mace for
breach of contract for Mace's failure to provide full payment for services rendered by Synagro on
the subcontract. Colonial does not dispute that Synagro has not been paid in full under the text
of the subcontract as written. In addition, Colonial does not dispute the validity of the subject

43

bond or its liability on the bond in the event that Mace is liable.  Accordingly, Synagro is entitled to summary judgment against Colonial for payment on the bond for the same amount owed by Mace for services rendered by Synagro.  Colonial is jointly and severally liable with Mace for the amount owed by Mace on the subcontract, including any applicable late fees and statutory interest.

## IV.     Defendants' Cross Motions for Summary Judgment

Mace cross-moves for summary judgment on its counterclaims.  Docket Entry #43, Mace's Motion for Summary Judgment; Docket Entry #46, Memo. of Law.  Synagro opposes the motion.  Docket Entry #64, Memo. of Law in Opp.  As discussed supra, Synagro is entitled to summary judgment dismissing Mace's counterclaims.  Consequently, Mace's motion is denied in its entirety.

Colonial also cross-moves for summary judgment, "incorporat[ing] by reference all arguments and defenses advanced by Mace, as well as Mace's counterclaims."  Docket Entry #53, Memo. of Law at 2; Docket Entry #52, Motion for Summary Judgment.  Neither in its opposition to Synagro's motion for summary judgment nor in its cross motion for summary judgment does Colonial make any mention of or reference to its own counterclaims.  See Docket Entry #11, Answer at 5-6.  Synagro opposes Colonial's motion.  Docket Entry #64, Memo. of Law in Opp.  Even assuming, without deciding, that Colonial can move for summary judgment on counterclaims asserted by Mace and not by itself, the cross motion is denied for the same reasons that Mace's cross motion for summary judgment is denied.

## V.     Colonial's Counterclaims

Colonial's counterclaims, as set forth in its Answer, are not designated as specific causes of action, but merely consist of general factual allegations of allegedly tortious behavior by

Synagro. See Docket Entry #11, Answer. Synagro does not move to dismiss such counterclaims, and Colonial does not move for summary judgment on them. Assuming that Colonial has not abandoned such counterclaims, it has failed to plead them with sufficient particularity, and they are essentially dealt with through the analysis of Mace's counterclaims. Accordingly, Colonial's counterclaims are sua sponte dismissed.

Colonial's first, third, and fourth counterclaims allege fraudulent behavior, some actual and some constructive, by Synagro in the contract-formation process. Its second counterclaim seeks rescission or reformation of the subcontract on the basis of a mutual mistake.

To state a claim of fraud in New York, one must allege "a representation of a material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by plaintiff and resulting injury." Monaco v. New York Univ. Medical Center., 213 AD2d 167, 169 (1st Dept. 1995), lv dismissed in part and denied in part 86 NY2d 882 (1995). "A cause of action sounding in constructive fraud, unlike actual fraud, does not require an assertion that the defendant had actual knowledge of the falsity of the representation." Id. at 168. Fed. R. Civ. P. 9(b) sets forth a heightened pleading requirement for a claim of fraud or mistake in federal court, requiring that the pleading "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006).

Colonial's first counterclaim seeks rescission or reformation of the subcontract on a constructive fraud and unilateral mistake theory that "Mace made a mistake regarding . . . the procedure and equipment necessary to perform the work," Docket Entry #11, Answer at ¶ 42, "Synagro knew or should have known that its special expertise and machinery were unnecessary

45

to perform the work," id. at ¶ 43, and " the mistake ha[d] a material adverse effect upon Mace in that the amount to be paid would be egregiously inflated." Id. at ¶ 44.  Colonial's third counterclaim, on which it also seeks rescission or reformation of the subcontract, sounds in fraud, claiming that "Synagro represented to Mace that its special expertise and equipment were necessary to perform the work," id. at ¶ 48, "Synagro knew or should have known that its special expertise and machinery were unnecessary to perform the work, but made the representation with the intent that Mace rely upon said representation and be induced to enter into a contract with Synagro," id. at ¶ 49, and "Mace actually relied upon Synagro's misstatements and has suffered actual damages." Id. at ¶ 50.  Colonial's fourth counterclaim alleges constructive fraud or negligent misrepresentation, mirroring the allegations in its third counterclaim except that it alleged that Synagro "made the representation negligently with the intent that Mace rely upon said representation and be induced to enter into a contract with Synagro. Id. at ¶ 55.  Colonial's second counterclaim seeks rescission or reformation of the subcontract the basis of a mutual mistake as to the "procedure and equipment necessary to perform the work." Id. at ¶ 47.

None of Colonial's counterclaims meet the pleading requirements of Fed. R. Civ. P. 9(b). The first, third, and fourth counterclaims fail to identify a specific statement made by one of Synagro's representatives, instead generally alleging that Synagro represented that special equipment and expertise were necessary.  Further, Colonial does not specifically identify who made such statement to Mace, nor does it state when or where such statement was made. Colonial's second counterclaim similarly fails to satisfy Rule 9(b)'s pleading requirements because it fails to specify a mutual mistake that revealed that the contract did not represent the parties' meeting of the minds, instead merely alleging the existence of a mutual mistake.  See Chimart, 66 NY2d at 573.  Instead, Colonial merely makes "[t]hreadbare recitals of the elements

46

of [each] cause of action, supported by mere conclusory statements," which is not sufficient to
properly state its claims. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Furthermore, Colonial
has made no effort to amend its pleading to set forth the counterclaims with more particularity.
Accordingly, they are sua sponte dismissed.

## VI. Synagro's Claim for Attorney's Fees Against Colonial

Citing New York State Finance Law § 137(4)(c), Synagro seeks to recover attorney's fees
from Colonial on the theory that Colonial's defense against liability on the bond was without
substantial basis in fact or law.[13]

New York State Finance Law § 137(4)(c) provides:

> In any action on a payment bond furnished pursuant to this section, any judgment in
> favor of a subcontractor or material supplier may include provision for the payment
> of interest upon the amount recovered from the date when demand for payment was
> made pursuant to the labor and material payment bond and provided further that the
> court may determine and award reasonable attorney's fee to either party to such
> action when, upon reviewing the entire record, it appears that either the original
> claim or the defense interposed to such claim is without substantial basis in fact or
> law.

It is not enough to show that a surety's defense was unsuccessful. Erie Materials, Inc. v.
Universal Group of New York, Inc., 101 AD 3d 1529, 1531 (3d Dept 2012); Beninati Roofing &
Sheet Metal Co., Inc. v. Gelco Builders, Inc., 279 AD2d 412, 412 (1st Dept. 2001).

Here, the mutual mistake defenses asserted by Colonial had no support in the record.
Specifically, there is no evidence before the Court that Synagro relied on the County's

---

[13] Synagro did not assert the claim against Colonial for attorney's fees under New York
State Finance Law § 137(4)(c) in its Complaint or Amended Complaint. However, because the
appropriateness of an award of attorney's fees is dependant on an insurer's conduct after the
filing of the complaint, rather than conduct prior to commencement of the action, it seems that
the claim for attorney's fees need not be pleaded. Further, Colonial does not oppose the
attorney's fees application upon such ground.

specification of 1,600 dewatered tons when it submitted the May 14, 2009, proposal or when it entered into the subcontract. Furthermore, the assertions of mutual mistake as to the composition of grit residue and the equipment necessary are merely bald attempts to insert new terms into the contract. The counterclaim for unjust enrichment is patently meritless because a valid contract existed. Finally, Colonial's assertion that Synagro breached the covenant of good faith and fair dealing is without basis because there is no assertion that Synagro in any way kept Mace from receiving its benefit under the subcontract. In sum, Colonial's defenses and counterclaims have no substantial basis, and, therefore, Synagro is entitled to attorney's fees. Such fees are limited to the costs incurred by Synagro in its litigation against Colonial. However, because Colonial's defenses, counterclaims, and arguments on the cross-motions for summary judgment echo those of Mace, Synagro may recover for the litigation of all such defenses, counterclaims, and arguments. The calculation of such fees will be addressed following the resolution of the remaining issue of damages.

## VII.  Conclusion

For the reasons stated above, Synagro's motion for summary judgment, Docket Entry #48, is granted in part. In accordance with this Decision and Order, Synagro's motion is granted as to liability against Mace and Colonial; the motion is further granted in the amount of $122,634.75 in damages against Mace and Colonial jointly and severally; the motion is further granted to award attorney's fees to Synagro against Colonial; and the motion to dismiss Mace's counterclaims as well as Mace's affirmative defenses based upon mutual mistake is also granted. The motion is otherwise denied. Colonial's counterclaims are sua sponte dismissed. The cross motions for summary judgment of Mace and Colonial are both denied in their entirety. The Clerk of the Court is directed to terminate the relevant motions (Docket Entries #43, 48, 52).

Synagro is to provide the Court with a detailed calculation of damages.  It should

thoroughly explain the basis for such figure, including the calculation of late fees and statutory

damages, and the calculation must be supported with sworn affidavits and documentary evidence

sufficient to support each part of the calculation.  Such submission is due no later than 30 days

after the date of this Decision and Order.  Defendants shall submit their response, if any, to

Synagro's submission no later than 30 days after receipt of Synagro's submission.  It is the

Court's intention to issue a Decision and Order concerning damages on the basis of the parties'

written submissions.  If the Court determines that a trial on the issue of the further damages is

necessary, it will so notify the parties.  The issue of the award of attorney's fees to Synagro for

its litigation against Colonial will be resolved after the determination of damages.


Dated: January 9, 2014

    White Plains, NY


                    SO ORDERED,



                    Lisa Margaret Smith
                    United States Magistrate Judge
                    Southern District of New York

A copy of the foregoing Decision and Order has been sent to the following:

George Sitaras
Peter Scutero
Sitaras & Associates, P.C.
33 Whitehall Street, 16th Floor
New York, NY 10003

Michael McDermott
Arthur J. Semetis, P.C.
21 East 40th Street, 14th Floor
New York, NY 10016

Michael Delaney
McElroy, Deutsch, Mulvaney & Carpenter, LLP
Wall Street Plaza, 88 Pine Street, 24th Floor
New York, NY 10005